**HANCOCK GROSS, INC.**

v.

**UNITED STATES.**

**C.D. 4555; Court No. 69/9241–100299.**

United States Customs Court.
Aug. 21, 1974.

TSUS item 773.25 as gaskets, of rubber or plastics, dutiable at only 9 per centum ad valorem. Defendant denies that the washers are gaskets and, in an affirmative defense, alternatively alleges that if the washers were not properly assessed under TSUS item 774.60, then they would be correctly classifiable under TSUS item 680.22 as parts of hand-operated and check taps, cocks, valves and similar devices used to control the flow of liquids, gases or solids, dutiable at 16 per centum ad valorem.

In open court, on the day of trial, counsel for defendant stated (R. 4) that "if the * * * [washers are] shown to be gaskets as claimed by plaintiff under item 773.25, on the gound of relative specificity that claim would prevail against both the assigned classification, which is articles of rubber or plastics, not specially provided for, item 774.60, or by virtue of the general headnote 10(i)(j) [1] of the Tariff Schedules against the Government's alternative claim as parts of taps, cocks, valves, et cetera [item 680.22]." Much of the discussion in the briefs relates to the merit or lack of merit of defendant's alternative claim but, as defendant has conceded in open court, the alternative claim is irrelevant if plaintiff's claim is well taken under TSUS item 773.25.

This brings me to consideration of the issue shaped by the pleadings and argument in this case, viz: whether the imported washers are gaskets in the tariff sense that "gaskets", of rubber or plastics, are provided for in item 773.25.

In determining the meaning of tariff terms, it is established that the tariff law is drawn in the language of commerce, which is presumptively the same as the common meaning, and that the law is not drawn in the terms of science, C. J. Tower & Sons v. United States, 41 CCPA 195, C.A.D. 550

Allerton deC. Tompkins, New York City, for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (Herbert P. Larsen and Andrew P. Vance, New York City, trial attys.), for defendant.

LANDIS, Judge:

This case involves tariff classification, under the Tariff Schedules of the United States (TSUS), of merchandise described in the record as faucet washers and imported from Japan in 1968.

Customs classified the washers under TSUS item 774.60 as articles, not specially provided for, of rubber or plastics, dutiable at 15 per centum ad valorem. Plaintiff challenges the customs classification in an allegation that the washers are more properly classifiable under

1. TSUS, General Headnotes and Rules of Interpretation, provides as follows:

10. *General Interpretative Rules.* For the purposes of these schedules—

 \* \* \* \* \*

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

(1954); it is further established that the common meaning of a tariff term is not a question of fact, but a question of law, United States v. Brager-Larsen, 36 CCPA 1, C.A.D. 388 (1948), and that the court is not bound by testimony with respect to the common meaning of a tariff term, as its effect is advisory only, and the court will ordinarily place chief reliance upon court decisions and definitions of dictionaries and other lexicographical authorities, United States v. Mercantil Distribuidora et al., 43 CCPA 111, C.A.D. 617 (1956).

Both sides agree that the imported washers of various sizes are wholly or in chief value of rubber or plastics; some have two flat surfaces (exhibits 1, 2, 3); some have one flat surface and one slightly beveled surface (exhibit 4); they are all circular disks with a hole in the middle, and all are chiefly used with faucets that have a turn stem or spindle to which the washer is attached at the seat end, usually by a screw in a manner that the washer moves with the turn of the stem or spindle, so that when the stem or spindle is turned "open" water flows and when the stem or spindle is turned "closed" the washer is pressed against the faucet seat and the flow of water and leakage is stopped.

The witnesses [2] also substantially agree that the imported washers are dealt with in the plumbing trade as "washers"; that the washers are chiefly used by the plumbing trade as pressure seals on faucets, in the manner alluded to above, primarily to assist in shutting off the flow of water and leakage across a joint (R. 36, 129, 191); that pressure seals include such as are called "packing", and such as are called "gaskets" (R. 60, 112, 168); that some pressure seals which are bought and sold as washers are in fact gaskets (R. 134, 164); and that the definition read into the record by defendant's counsel, namely, "a deformable material clamped between essentially stationary faces to prevent the passage of matter through an opening or joint," acceptably defines a "gasket" (R. 65, 106, 163).

Plaintiff, in argument anticipating defendant's contention that gaskets are limited to seals between stationary surfaces, is of the view that such contention must be rejected on authority of Arthur J. Fritz & Co. et al. v. United States, 63 Cust.Ct. 484, C.D. 3940 (1969), affirmed on appeal, 59 CCPA 46, C.A.D. 1036, 452 F.2d 1399 (1971). The Fritz case sustained the customs classification of rubber rings, used to seal a joining of pipes and couplings against leakage, as gaskets, of rubber or plastics, under TSUS item 773.25, rather than as parts of sprayers suitable for agricultural or horticultural use.

In my opinion, the facts in the Fritz case were quite similar to those in the case here for decision. Referring to the court of appeals decision in Fritz, I note the following discussion (59 CCPA at pages 48–49, 452 F.2d at page 1401):

The imported articles were invoiced as sealing rings and are used in irrigation equipment. A ring is positioned at the junction of a pipe and a coupling, and when water is forced through the junction, the water pressure expands the ring so as to effect a seal which prevents seepage or drainage of water at that point. It is undisputed that in this capacity the sealing rings function as gaskets. When the flow of water and pressure is terminated, the ring relaxes and permits water drainage from the pipes. Irrigation pipes are moved frequently in the field, and the residual water is a load which the testimony at trial indicates is so great that movement of the pipe is virtually impossible. The automatic drainage allowed by the imported sealing rings overcomes this problem. Because the rings allow this drainage to occur, the rings are, appellants [plaintiffs below] urge, more than gaskets.

2. One witness testified for plaintiff. Two witnesses testified for defendant. Defendant also introduced a number of illustrative washers (exhibits A, B, D, E).

The Customs Court referred to several dictionary definitions of gasket which read:

Plaited hemp or tallowed rope for packing pistons, making pipe joints, etc.; hence packing for the same purpose made of rubber, asbestos, metal, or other suitable material, usually in the form of sheets or rings. [Webster's New International Dictionary of the English Language, Second Edition (1958).]

(1) A thin, flat, annular packing-piece of india-rubber, leather, or sheet metal, placed between two flat surfaces, as a manhole-plate and a boiler-head, to make their joint watertight. (2) A packing of hemp or other fibrous stuff, or of lead, between the bell of one pipe and the spigot or male end of another. [Funk & Wagnalls New "Standard" Dictionary of the English Language (1956).]

Structurally, the imported articles are, as described by name, rings, and are made of rubber. In structure, and function as well, the merchandise conforms to that commonly understood to be gaskets. The difficulty in distinguishing the rings from gaskets is further apparent from the testimony of the plaintiffs' witness at trial on cross-examination, which was, in pertinent part, as follows:

Q. Mr. Lake, will you further describe how the draining takes place in this operation?

A. The gasket is not a tight fit on the pipe or the coupling until it is expanded by the internal pressure [of the water].

Q. In use it is used as a gasket, it seals?

A. It seals, yes, sir.

Q. And it ceases being a gasket, if I understand, according to what you are saying, when it's not in use? In other words, when it drains?

* * * * * *

A. How could it cease to be?

Q. It's still a gasket?

A. Yes.

Q. It would be a gasket if you carried it around in your hand before you put it on?

* * * * * *

A. You pick it up, you can call it a gasket or sealing ring.

Q. Essentially, this is a loose-fitting gasket specially designed for this operation?

A. You could call it that, or you could call it packing.

The conclusion of the Customs Court was that in use, the rings functioned as gaskets. Appellants argue that the draining operation is also a use and because it is capable of the dichotomous function of sealing and draining, the rings more resemble valves than gaskets. We do not think the analogy is well-taken. In the case of the instant rings, they are made loose-fitting to accomplish a merely incidental purpose; their structural design is geared to what we are constrained to hold to be the primary purpose—sealing.

In *Fritz*, appellants (plaintiffs below), argued without success that although the Customs Court had held that in use the rings functioned as gaskets, the draining operation was also a use, and because of the dichotomous functions of sealing and draining, the rings more resembled valves than gaskets. Here defendant has argued that the imported faucet washers are chiefly used as parts of valves, faucets, etc., which in turn are used to control the flow of liquids, and that they cannot be considered to be gaskets which are to provide a static seal between two stationary surfaces. However, defendant's argument that the function of the imported faucet washers is not that of a static seal between stationary surfaces is inconsistent with testimony elicited from its own witness, Mr. O'Mahoney, who testified contrariwise as follows:

Q. I show you Plaintiff's Exhibits 1, 2, 3 and 4 and I ask you if you rec-

ognize these items, based upon your experience and your familiarity with the line of plumbing goods?—A. They are faucet washers. [R. 81–82.]

\* \* \* \* \* \*

Q. What would the chief uses of faucet washers be?—A. Faucet washers are used as a shut-off in an operating valve such as a kitchen faucet, a basin faucet, or a bath faucet, and shut-off valves, supply valves.

Q. About how many faucet washers does your company manufacture or sell in a given year?—A. I don't remember the figures. I would say between six and eight million combined.

Q. Can you approximate how many of these would be used in applications such as those you have expressed a first-hand familiarity with?—A. All of them; 100 percent.

Q. Then is the only use that you know of for such faucet washers in connection with faucets and appliances such as you have previously described?—A. Yes, sir. [R. 98–99.]

Defendant's argument is also inconsistent with testimony of its witness Mr. Curtin who, when cross-examined about his opinion that faucet washers are an extension of the stem or spindle that controls the flow of the water, testified as follows:

Q. The purpose of the washer is that when it gets all the way down it will stop the flow of the water, is that correct?—A. Provides a seating surface for the stem so that you don't have metal to metal, yes, sir.

Q. It's to stop the flow of water, is that correct?—A. Yes, sir.

Q. That's the primary function of the washer?—A. Yes sir.

Q. That would be the primary function of washers like Exhibits 1, 2, 3, 4, and D, according to your experience?—Yes, sir.

Q. Now, when the faucet or valve is in a closed position are the two faces essentially stationary, when in a closed position?—A. The washer and the seat, yes, sir, when they are fully closed.

Q. What's your answer?—A. Yes, sir. [R. 191–192.]

However, aside from the unconvincing character of defendant's evidence to support its contentions, assuming as in *Fritz*, that the imported faucet washers performed the function of sealing (which is certainly supported by the evidence) and the dichotomous function of acting as a part of the stem or spindle in a faucet, the latter's purpose concededly being to control the flow of liquids, it cannot be said that the washers more nearly resemble parts of valves than gaskets. As the court of appeals observed in *Fritz, supra*:

> \* \* \* In structure, and function as well, the merchandise conforms to that commonly understood to be gaskets. \* \* \*
>
> \* \* \* \* \* \*
>
> \* \* \* We do not think the analogy [of the imported rings to valves] is well-taken. In the case of the instant rings, they are made loose-fitting to accomplish a merely incidental purpose; their structural design is geared to what we are constrained to hold to be the primary purpose—sealing.

The rings in *Fritz* had been modified and made loose-fitting to accomplish another purpose—drainage. This was held by the court, however, to be incidental and not sufficient to alter the primary purpose—sealing. In the case before us, the evidence is even stronger for plaintiff-importer. There is no evidence whatever of any modification in the structure or design of the imported merchandise in any respect to detract from its function in acting as a seal.

 In addition to these observations which I consider sufficient to dispose of this case in plaintiff's favor, I note that defendant argues that in common meaning "gaskets" are commonly accepted and defined as articles "whose function is to provide a stationary seal between

two stationary surfaces." This, however, is materially different from the definition defendant read into the record, which defined "gaskets" as "deformable material clamped between *essentially* stationary faces" (emphasis added). I, for one, am not certain what constitutes "essentially stationary" surfaces and there is, in this record, no adequate proof of what it means. If it means surfaces that are completely stationary with no movement in the joint sealed by the gasket, why say "essentially" and not just "stationary" as edited by defendant.[3] The primary function of faucet washers is to seal the flow of water when the valve is shut off. Faucet washers, in my opinion, plausibly perform that function between two faces or surfaces that are essentially stationary.

For the reasons discussed herein plaintiff's claim under TSUS item 773.-25 is sustained.

Judgment will enter accordingly.

3. The word "essentially" is usually employed to modify terms intended to be close approximations. Cf. Janzen v. Phillips, 73 Wash.2d 174, 437 P.2d 189, 191–192 (1968).